**This version includes the errata dated 30Jun09-e**

## UNITED STATES COURT OF APPEALS FOR VETERANS CLAIMS

No. 07-0349

RICHARD S. BROKOWSKI, APPELLANT,

V.

ERIC K. SHINSEKI,
SECRETARY OF VETERANS AFFAIRS, APPELLEE.

On Appeal from the Board of Veterans' Appeals

(Argued December 3, 2008                    Decided June 8, 2009)

*Lewis C. Fichera*, of Sewell, New Jersey, for the appellant.

*Kerry J. Loring* argued for the appellee; *Shayla N. McGee,* with whom *Paul J. Hutter*, General Counsel; *R. Randall Campbell*, Assistant General Counsel; *and Brian B. Rippel*, Deputy Assistant General Counsel, were on the brief, all of Washington, D.C., for the appellee.

Before HAGEL, LANCE, and SCHOELEN, *Judges*.

SCHOELEN, *Judge*: The appellant, Richard S. Brokowski, through counsel, appeals a January 11, 2007, Board of Veterans' Appeals (Board) decision in which the Board found service connection for peripheral neuropathy was warranted, but denied an effective date for the award of service connection earlier than February 15, 1994. In the same decision, the Board remanded the issue of entitlement to a disability rating in excess of 40% for peripheral neuropathy of the right and left lower extremities.[1] Record (R.) at 1-31. This appeal is timely, and the Court has jurisdiction to review the Board's decision pursuant to 38 U.S.C. §§ 7252(a) and 7266(a). For the following

---

[1] The Board remanded the disability rating issue for the VA regional office (RO) to obtain current medical evidence regarding the severity of the disabilities.

reasons, the Court will affirm the Board's decision.

# I. BACKGROUND

## A. Service History and Medical Evidence

The appellant served in the U.S. Navy from February 1965 to September 1969. R. at 32. In December 1976, he was hospitalized with complaints of pain in his right foot radiating into his calf, and burning and numbness on the bottom of his right foot. R. at 244-45. On physical examination, the appellant's right foot was discolored and cool to the touch. *Id*. A specialized radiograph showed that the appellant's superficial femoral artery, located in his thigh, was totally blocked and that the artery located over his knee had deposits of calcium obstructing blood flow. These conditions resulted in weakness in his leg. R. at 244-45. Dr. Robinson, one of the appellant's private physicians, noted that

> [t]he patient had many unusual aspects of his pain in that he did have tenderness to touch along the area of the lateral aspect of his right foot. It was my impression that it is possible that the patient did have some other neurological problem that would be accounting for this pain other than on a vascular basis. It is quite surprising to see pain to touch without any evidence of rest pain at all. The patient did definitely have a vascular lesion, did have symptoms of claudication.[2]

R. at 245. Dr. Robinson recommended that if the appellant received no relief from this surgery, he undergo further neurological and orthopedic consultations to rule out the possibility of some other neurological or orthopedic disease as a source of the appellant's pain. R. at 246.

In January 1977, the appellant underwent surgery in his lumbar region in an effort to relieve his pain. R. at 242. At that time, Dr. Robinson noted that the appellant suffered from both pain resulting from the obstructed blood flow and a "second pain which could possibly be secondary to" a neuroma (tumor) growing from a nerve. R. at 241. Dr. Robinson diagnosed the appellant with

---

[2]

      Claudication is limping or lameness that is often characterized by pain, tension, and weakness in a limb. DORLAND'S ILLUSTRATED MEDICAL DICTIONARY 361 (29th ed. 2000) [hereinafter DORLAND'S]. Claudication is seen in occlusive arterial disease of the limbs. *Id.*

[3] A Morton's neuroma is a tumor that develops as a result of chronic compression of a plantar nerve in the foot. DORLAND'S at 1206.

"arterial vascular insufficiency, right lower extremity with lesion of his right superficial femoral artery, possible Morton's neuroma,[3] right metatarsal area, and status postop right lumbar sympathectomy."  R. at 242.


The appellant's pain persisted after the January1977 surgery. In February1977,  radiographs of the spine were performed, and the appellant was diagnosed with compression and disease of the L5 nerve root with herniated disc at L4-5 and L5-S1 and L5-S1 radiculopathy.[4] R. 232-33.  The appellant underwent an operation to remove a portion of his vertebrae.  *Id*.  The appellant's pain persisted after this surgery, and in April 1977, he was hospitalized again by Dr. Robinson to treat the blocked arteries in his right leg. R. at 262-65.  The appellant underwent a surgery that involved "excisionofright greater saphenous vein[5] with ligation of its tributaries; right femoral anterior tibial bypass using the patient's saphenous vein; right femoral arteriograft."  *Id*.

At the time of the appellant's discharge from the hospital,  Dr. Robinsondiagnosed him with "peripheral vascular disease[6] manifested by complete occlusion[7] of the right superficial femoral, right popliteal and right posterior tibial arteries; status postop right lumbar sympathectomy; status postop right femoral anterior tibial bypass using patient's own saphenous vein."  R. at 263.  Unlike Dr. Robinson's January 1977 diagnosis, his April 1977 diagnosisdidnot mention Morton's neuroma as a possible disorder, and there was no suggestion that Dr. Robinson continued to suspect that the appellant had an unidentified neurological or orthopedic disorder.

## B. Pension Claim

In January 1977, the appellant filed a claim for non-service-connected pension benefits.

---

4

   Radiculopathy is a disease involving the nerve roots.  DORLAND'S at 1511.

  [5]  The right great saphenous vein runs along the inner thigh into the lower right leg.  DORLAND'S at 1942.

  [6]  Peripheral vascular diseases of the extremities may involve arteries and veins.  THE MERCK MANUAL 555 (15th ed. 1987). The initial symptoms of the disorder involve intermittent claudication on walking.  *Id*. at 556.  The pain is usually relieved by rest. *Id.*  If the disease progresses there may be ischemic pain at rest as well as when walking. *Id.*
A severely ischemic foot is painful, cold, and often numb. *Id*.

  [7]  An occlusion is an obstruction. DORLAND'S at 1252.

3

In August 1977, the RO granted the claim.[8] R. at 250, 285.

### C. Anxiety Disorder Claim

In June 1978, the appellant filed a statement in support of claim stating: "I would like to claim service connection for mypresent conditionofacutedepression[and] anxiety. I have had this condition since discharge from service and was treated for this condition." R. at 299. He indicated that hehad "received treatment in the service as follows: Acute [d]epression San Diego, Ca[lifornia and] anxiety Service School Command approx[imately] 1968." *Id.* He also stated: "This is also a claim for service[]connection for all disabilities of record." *Id.* No other documents accompanied his statement in support of claim. In July 1978, the RO denied benefits based on anxiety and depression. R. at 305. No other disabilities were mentioned in the rating decision. R. at 306. The notice letter that was sent to the appellant only discussed denial of service connection for a nervous condition. R. at 305. The appellant did not appeal that RO decision.

### D. Peripheral Vascular Disease Claim

In October 1989, the appellant filed a claim for VA benefits for "severe peripheral vascular disease" that he claimed began in 1976. R. at 310-13. In support of the claim, the appellant submitted medical evidence indicating that he had been diagnosed and treated for peripheral vascular disease. R. at 319-22. In February 1990, the RO denied the claim after concluding that the appellant's peripheral vascular disease was not incurred or aggravated in service. R. at 333-35. The appellant filed a timely Notice of Disagreement (NOD). R. at 337. However,theROdid not process the appeal by issuing a Statement of the Case (SOC).

### E. Retention of Counsel and Peripheral Neuropathy Claim

In April 1993, the appellant retained his present counsel who notified the RO by letter that the appellant was filing a claim for benefits based on peripheral vascular disease. R. at 345-46. The appellant's counsel attached an application for VA benefits to his correspondence. *Id.* In the application, the appellant stated that he was seeking service connection for "severe peripheral vascular disease," which became "manifest in 1976." R. at 349. In February 1994, the appellant's

---

[8]

     In January 1978, the appellant's pension award was terminated after the RO determined that his income exceeded the statutory limits for eligibility for pension benefits. R. at 294.

counsel sent the RO a letter to "clarify" the appellant's claim.  R. at 373-75.  He indicated that *in addition to* peripheral vascular disease, the appellant was seeking service connection for peripheral neuropathy,[9] a disorder that the appellant's physicians recently diagnosed in October 1993.  *Id.*

In support of the appellant's claim for benefits based on peripheral neuropathy, he submitted an October 1993 nerve conduction study diagnosing him with peripheral neuropathy and an October 1993 medical statement from one of his treating physicians stating that he began treating the appellant for peripheral neuropathy in 1977. R. at 377-80.  In June 1994, the RO continued its denial of the claim for disability compensation for peripheral vascular disease.  R. at 409-11.  In January 1995, the RO denied the appellant's claim for VA benefits for peripheral neuropathy. R. at 417-18.

In November 2002, after lengthy proceedings before the RO, which included two Board remands, the Board granted disabilitycompensation benefits for bilateral peripheral neuropathy and it denied benefits for peripheral vascular disease.  R. at 882-95.

In December 2002, the RO assigned a 40% disability rating for peripheral neuropathy of the right lower extremity and a 20% disability rating for peripheral neuropathy of the left lower extremity, effective December 1994. R. at 897-901. After several medical examinations, in April 2004 the RO issued a rating decision continuing the disability ratings for the appellant's right and left leg peripheral neuropathy.  R. at 964.

F.  Appeal of RO Decision Regarding Peripheral Neuropathy Claim

In May2004, the appellant filed an NOD with the April 2004 rating decision contesting both the disability rating and the effective date of the disability ratings for peripheral neuropathy. R. at 973.  In November 2004, the RO increased the disability rating for the appellant's left lower extremity to 40%, awarded a 100% disability rating based on individual unemployability, and amended the effective date for peripheral neuropathy for both extremities to February 15, 1994, the

---

[9]

Peripheral neuropathy is a disorder involving a disturbance in the peripheral nervous system.  The peripheral nervous system involves those nerves located outside the central nervous system (outside the brain and spinal cord). DORLAND'S at 1198, 1212.

date on which the RO received correspondence from the appellant's attorney stating that the appellant was seeking service connection for peripheral neuropathy. R. at 1102-14.

In the January 11, 2007, decision here on appeal, the Board denied an effective date earlier than February 15, 1994, for service connection for peripheral neuropathy. R. at 1-29. The Board concluded that the appellant did not file a claim for benefits for peripheral neuropathy prior to that date. R. at 20-22. In its decision, the Board concluded:

> The veteran first submitted a claim for service connection for peripheral neuropathy that was received on February 15, 1994. He submitted medical evidence of that disorder at that time, *the first evidence of record of the disorder.* Earlier claims and earlier medical evidence do not reflect an intent to apply for service connection of peripheral neuropathy and do not establish the veteran as having peripheral neuropathy. The RO established the effective date as the date of claim and that is the earliest effective date available to the veteran. The veteran's claim is denied.

R. at 22 (emphasis added).

## II. ANALYSIS

The appellant argues that because the medical record contains evidence of peripheral neuropathy existing prior to February 15, 1994, he is entitled to an earlier effective date for the commencement of his disability compensation award based on peripheral neuropathy. He contends that he filed an informal claim for benefits based on this disability when he filed his 1978 application seeking service connection for depression and anxiety and "all disabilities of record." Appellant's Brief (Br.) at 9-14. He further asserts that what he characterizes as his 1978 claim for benefits for peripheral neuropathy remained pending until January 1995 when the RO denied service connection for this disorder. Appellant's Br. at 11-13. Alternatively, he argues that he is entitled to an earlier effective date on the basis of his October 1989 application for VA benefits for peripheral vascular disease. *Id*. at 14-19. He contends that his 1989 application for peripheral vascular disease also included a claim for VA benefits for peripheral neuropathy because the evidence of record disclosed that the appellant suffered from peripheral neuropathy. *Id*.

The Secretary counters that the appellant did not request VA benefits for peripheral neuropathy until February 1994 and that prior to that date there was no evidence of an intent to file a claim for benefits for peripheral neuropathy because that disorder had not even been diagnosed

6

until October 1993, after the appellant filed his 1978 and 1989 claims. Appellee's Br. at 14- 21.

In general, the effective date for the commencement of disability compensation awarded as the result of a service-connected disability can be no earlier than thedatethat VA received the claim for benefits based on that particular disability. Section 5110(a) of title 38, U.S. Code, provides, in relevant part:

> [T]he effective date of an award based on an original claim, a claim reopened after final adjudication, or a claim for increase, of compensation, dependency and indemnity compensation, or pension, shall be fixed in accordance with the facts found, but shall not be earlier than the date of receipt of application therefor.

38 U.S.C. § 5110(a); *see also* 38 C.F.R. § 3.400 (2008). The Board's determination of the effective date for disabilitycompensation for a service-connected disability is a finding of fact that the Court reviews under the "clearly erroneous" standard set forth in 38 U.S.C. § 7261(a)(4). *See Evans v. West*, 12 Vet.App. 396, 401 (1999); *Hanson v. Brown*, 9 Vet.App. 29, 32 (1996). "A factual finding 'is "clearly erroneous" when although there is evidence to support it, the reviewing court on the entire evidence is left with the definite and firm conviction that a mistake has been committed.'" *Hersey v. Derwinski*, 2 Vet.App. 91, 94 (1992) (quoting *United States v. U.S. Gypsum Co.*, 333 U.S. 364, 395 (1948)). The Court maynot substitute its judgment for the factual determinations of the Board on issues of material fact merely because the Court would have decided those issues differently in the first instance. *See id.*

A claim of entitlement to VA benefits may be either a formal or an informal written communication requesting a determination of entitlement or evidencing a belief in entitlement to a benefit. 38 C.F.R. § 3.1(p) (2008). "Any communication or action, indicating an intent to apply for one or more benefits under the laws administered by [VA] . . . maybeconsidered an informal claim. *Such informal claim must identify the benefit sought*." 38 C.F.R. § 3.155(a) (2008) (emphasis added). Thus, it follows that (1) an intent to apply for benefits, (2) an identification of the benefits sought, and (3) a communication in writing are the essential requirements of any claim, whether formal or informal. 38 C.F.R. § 3.159(a)(3) (2008) (defining a "[s]ubstantially complete application" for benefits as one that, inter alia, identifies "the benefit claimed and any medical condition(s) on which it is based");*see also MacPhee v. Nicholson*, 459 F.3d 1323, 1325 (Fed. Cir. 2006) ("Section 3.155(a) is directed to an original informal claim and requires the informal claim 'identify the benefit sought' *and* 'indicat[e] an intent to apply for one or more benefits.'" (emphasis added)); *Brannon v. West*, 12 Vet.App. 32, 35 (1998) (holding that before VA can adjudicate an original claim for benefits, "the claimant must submit a written document identifying the benefit *and* expressing some intent to seek it"); *see also Criswell v. Nicholson*, 20 Vet.App. 501, 504 (2006) ("The mere existence of medical

records generally cannot be construed as an informal claim; rather, there must be some intent by the claimant to apply for a benefit." (citing *Brannon*, 12 Vet.App. at 35)). Although the Board must interpret a claimant's submissions broadly, "the Board is not required toconjure upissues that were not raised by the claimant." *Brannon,*12Vet.App. at 35; *see Criswell*, 20 Vet.App. at 503-04 ("[I]t follows logically that where there can be found no intent to apply for VA benefits, a claim for entitlement to such benefits has not been reasonably raised.") However, a claimant's identification of the benefit sought does not require any technical precision. *See Ingram v. Nicholson*, 21 Vet.App. 232, 256-57 (2007) ("It is the pro se claimant who knows what symptoms he is experiencing and that are causing him disability, . . . . [and] it is the Secretary who knows the provisions of title 38 and can evaluate whether there is a potential under the law to compensate an averred disability based on a sympathetic reading of the material in a pro se submission." (citations omitted)). The determination of whether an informal claim has been filed is a substantially factual determination that the Court reviews under the "clearly erroneous" standard of review. *See* 38 U.S.C. § 7261(a)(4); *Ellington v. Nicholson,* 22 Vet.App. 141, 144 (2007), *aff'd* 541 F.3d 1364 (Fed. Cir. 2008); *Criswell,* 20 Vet.App. at 504.

VA is required to identify and act on informal claims for benefits, 38 U.S.C. § 5110(b)(3); 38 C.F.R. §§ 3.1(p), 3.155(a), and must fully and sympathetically develop a veteran's claim to its optimum before reachingthe claim on its merits. *Hodge v. West,* 155 F.3d 1356, 1362-63 (Fed. Cir. 1998). Developing a claim to its optimum requires that, except where a represented claimant requests revision of a final decision based on clear and unmistakable error, the Secretary give a sympathetic reading to a pro se veteran's filings by "determin[ing] all potential claims raised by the evidence, applying all relevant laws and regulations, regardless of whether the claim is specifically labeled as a claim for [a particular benefit]." *Roberson v. Principi,* 251 F.3d 1378, 1384 (Fed. Cir. 2001); *Szemraj v. Principi,* 357 F.3d 1370, 1373 (Fed. Cir. 2004); *see also Robinson v. Shinseki,* 557 F.3d. 1355, 1361 (Fed. Cir. 2009) (holding that "[i]n direct appeals, all filings must be read 'in a liberal manner' whether or not the veteran is represented").

Moreover, "the Board is required to adjudicate all issues reasonably raised by a liberal reading of . . . all documents and oral testimony in the record prior to the Board's decision." *Brannon,* 12 Vet.App. at 34; *see Solomon v. Brown,*6 Vet.App. 396 (1994). Whether a sympathetic reading

of prior filings raises an informal claim for benefits is essentially a factual inquiry that is reviewed under the "clearly erroneous" standard. *See Moody v. Principi,* 360 F.3d 1306, 1310 (Fed. Cir. 2004); *Beverly v. Nicholson,* 19 Vet.App. 394, 405 (2005).

A "pending claim" is "[a]n application, formal or informal, which has not been finally adjudicated." 38 C.F.R. § 3.160(c) (2008). Consistent with this regulation, this Court has held that "[a] reasonably raised claim remains pending until there is either a recognition of the substance of the claim in [an RO] decision from which a claimant could deduce that the claim was adjudicated or an explicit adjudication of a subsequent 'claim' for the same disability." *Ingram,* 21 Vet.App. at 243; *see also Myers v. Principi,* 16 Vet.App. 228, 236 (2002) (explaining that a pending claim can be addressed in a subsequent adjudication); *Hanson,* 9 Vet.App. at 31 (stating that a claim remains pending until final action is taken or the claim is withdrawn); *Meeks v. Brown,* 5 Vet.App. 284, 287 (1993) (holding that a "1970 rating decision was not a final decision and [the case] remains pending"). When a claimant files a timely NOD as to a claim, but the RO fails to respond by issuing an SOC, that appeal remains pending despite any subsequent denials at the RO level. *See Tablazon v. Brown,* 8 Vet.App. 359, 361 (1995); *see also Juarez v. Peake*, 21 Vet.App. 537, 543 (2008) (noting that "[o]nly a subsequent Board decision can resolve an appeal that was initiated but not completed").

### A. An Informal Claim for Benefits for Peripheral Neuropathy Based on the Appellant's 1978 Application

The appellant argues that at the time that he filed his 1978 claim for benefits for depression and anxiety, the Board should have sympathetically read his application to include an informal claim for benefits for peripheral neuropathy. Appellant's Br. at 14. In support of this argument, he contends that by including the term "all disabilities of record," in his 1978 application, he made his intent clear that he was seeking benefits for more than anxiety and depression. Appellant's Br. at 1011. He argues further in his brief that because the medical information in the record at the time of his 1978 application "contained diagnoses of a neurological disease in the lower extremities," he filed an informal claim for benefits for peripheral neuropathy. Appellant's Br. at 7, 10-11. Elsewhere, he argues that he had submitted evidence that "diagnosed neuropathy" with his claim. *Id*. at 3. We disagree with the appellant's arguments.

9

As noted above, an informal claim for VA benefits must identify the benefit sought. 38 C.F.R. § 3.155(a). The appellant asserts that by including the phrase "and all disabilities of record" he indicated an intent to apply for disability compensation benefits for peripheral neuropathy. Appellant's Br. at 7. In essence, he argues that the use of that phrase indicates an intention to apply for every benefit that might be implied by some entry in the record then before VA. In this case, the use of the phrase "all disabilities of record" is insufficient to satisfy the specificity required by § 3.155(a)'s requirement that a claim must "identify the benefit sought." Therefore, the Court holds that the Board's finding that the appellant did not file an informal claim for compensation for peripheral neuropathy in 1978 is supported by the record because the appellant did not identify peripheral neuropathy as a benefit for which he was seeking disability compensation.

The requirement to identify the benefit sought means that a claimant must describe the nature of the disability for which he is seeking benefits. *See Ingram*, 21 Vet.App. at 256. A claimant may satisfy this requirement by referring to a body part or system that is disabled or by describing symptoms of the disability. *See Clemons v. Shinseki*, 23 Vet.App. 1, 5 (2009) (stating that, when determining the scope of a claim, the Board must consider "the claimant's description of the claim; the symptoms the claimant describes; and the information the claimant submits or that the Secretary obtains in support of that claim"); 38 C.F.R. § 3.159(c)(3); *see also* R. at 220 (VA Form 21-526 Veteran's Application for Compensation and Pension, Block 25 instructing the appellant to provide the "NATURE OF SICKNESS, DISEASE OR INJURIES FOR WHICH THE CLAIM IS MADE"). Here, the appellant's 1978 application contained no reference to peripheral neuropathy and provided no description of the symptoms he was experiencing. Furthermore, the medical records submitted in support of that application provided no information that would enable VA to determine that the nature of his disability involved peripheral neuropathy.

Contrary to the appellant's argument, the medical records submitted in connection with his 1978 application do not include a diagnosis of peripheral neuropathy. In this regard, the Board's finding that the medical records in the appellant's claims file in 1978 did not contain *any* reference to peripheral neuropathy is supported by the record on appeal. R. at 20, 22, 229-46. Indeed, the medical records reflect that when the appellant sought treatment for his disability in December 1976 and January 1977, Dr. Robinson initially believed that it was possible that he had a neurological or

orthopedic problem that was partly responsible for his symptoms. R. at 245-46. In January 1977, Dr. Robinson identified the suspected neurological disease as a Morton's neuroma (a tumor involving nerve cells) located in theappellant's right foot. R. at 241-42. After the appellant underwent further testing recommended by Dr. Robinson in February 1977, he was diagnosed with an orthopedic problem involving a herniated disk and radiculopathy in his lower back. R. at 232-33.

Dr. Robinson's discharge diagnoses after the appellant underwent bypass surgery in April 1977, to address his blocked artery, does not contain any further discussion regarding a suspected neurological disorder. Furthermore, Dr. Robinson did not recommend that the appellant undergo any further testing to rule out a neurological disorder. Thus, the medical records indicate that even during the short period between December 1976 and January 1977 when Dr. Robinson suspected that the appellant had a neurological disorder, he never mentioned peripheral neuropathy as a possible diagnosis. *Id.* In fact, as the Board correctly noted, a diagnosis of peripheral neuropathy was not made until 1993–15 years after the appellant filed his 1978 application. R. at 20, 377-80. Therefore, to the extent that the medical records the appellant submitted to support the 1978 application discussed thepossibilitythat hehad anyneurological disorder,theBoard had a plausible basis for finding that there was no indication that peripheral neuropathy was considered to bea cause of the appellant's disability. In fact, the medical records indicate that when the appellant filed his 1978 application, his treating physicians had concluded that the disability involving his lower extremities was attributed solely to a peripheral vascular disorder and a lumbar back disorder.

To further support the appellant's argument, he relies on a January 1977 medical report that indicated that the appellant had "neuropathic changes" in his lower extremities. R. at 428; Appellant's Br. at 10. However, this report does not support the appellant's argument for two reasons. First, the 1977 medical report was not before the RO at the time of the 1978 application. The record showsthat this document was not included in therecord until after the appellant filed his claim in February 1994. R. at 421-28. Second, it is clear that the January 1977 medical report attributes the "neuropathic changes"to a back disability and not to peripheral neuropathy. R. at 428. Therefore, the Court is not persuaded by the appellant's argument that the January 1977 document demonstrates that the Board erred in finding that there was no diagnosis of peripheral neuropathy in the record until the appellant filed his claim in February 1994. R. at 20.

11

The Court is also not persuaded by the appellant's argument that a reference in the medical records to one specific neurological disorder–Morton's neuroma–is sufficient to raise an informal claim for benefits based on another specific neurological disorder–peripheral neuropathy–that was not diagnosed until many years after the appellant filed his 1978 application with VA. Although a medical diagnosis is not a requirement to establish service connection, there must be sufficient information to identify the nature of the disability. *See Boggs v. Peake*, 520 F.3d 1330, 1336 (Fed. Cir. 2008) (stating that there is no requirement that a veteran must submit a diagnosis by a medical doctor to establish a claim for service connection); *Clemons*, 23 Vet.App. at 6-7. Here, the Board correctly determined that there was no information in the appellant's 1978 application to identify peripheral neuropathy as a disability for which the appellant was seeking benefits. The "sympathetic reading" requirement does not obligate the Board to conduct an exercise in prognostication, but only requires that it consider all claims *reasonably* raised by the evidence. *See Talbert v. Brown,* 7 Vet.App. 352, 356-357 (1995).

A VA adjudicator is not required to anticipate a claim for benefits for disabilities that have not been identified in the record by medical professionals or by competent lay evidence at the time that a claimant files a claim or during the claim's development. The requirement that a claimant identify the benefit that he is seeking makes it possible for VA to develop and adjudicate the claim. Here, although the limited question of possible neurological involvement in the appellant's disability picture was briefly raised by the one of the appellant's physicians, that question appears to have been resolved negatively by the time the appellant had filed his 1978 claim. When the appellant filed his 1978 claim, VA had no reason to suspect that the appellant had a neurological disorder, much less peripheral neuropathy. By requiring the Secretary to have opened an informal claim in 1978 as to *any* possible neurological disorder with which this appellant might be diagnosed at a future date would have created uncertainty as to what disabilities were involved in the 1978 claim. This would have created an unreasonable burden on VA to develop and adjudicate a claim for benefits based on a disorder that was not identified at the time the 1978 claim was filed.

We do not hold that the inclusion of the term "all disabilities of record" in an application for VA benefits coupled with the submission of particular medical records can be ignored in determining whether the appellant has sufficiently identified the benefit he is

12

seeking.[10] For example, if that term is used and if selected records are submitted to support the claim and they clearly discuss disabilities or *specific* symptoms other than those listed on the application, it may be inferred that those records were submitted because the appellant intended to apply for benefits for those conditions or conditions that are suggested by the specified symptoms. *Moody,* 360 F.3d at 1310; *Szemraj,* 357 F.3d at 1373; *Roberson,* 251 F.3d at 1384; *Hodge,* 155 F.3d at 1362-63. However, the Court cautions that such language or the indiscriminate inclusion of materials with an application for benefits cannot be used as a pleading device to require the Secretary to conduct an unguided safari through the record to identify all conditions for which the veteran may possibly be able to assert entitlement to a claim for disability compensation. Such a requirement would nullify the specificity required by § 3.155(a). *See Wood v. Derwinski*, 1 Vet.App. 190, 193 (1991) ("The duty to assist is not always a one way street."); *cf. Gobber v. Derwinski*, 2 Vet.App. 470, 472 (1992) ("[T]he duty to assist is not a license for a 'fishing expedition' to determine if there might be some unspecified information which could possibly support a claim"). Also, if allowed, any veterans representative would be remiss if the representative failed to advise a claimant to use such language in his or her application. It is the Secretary's duty to "know[] the provisions of title 38 and . . . evaluate whether there is a potential under the law to compensate an averred disability based on asympathetic reading of the material in a pro se submission." *Ingram*, 21 Vet.App. at 256-57. Here, the Secretary satisfied his duty and we are not firmly convinced that the Board erred in finding that the appellant did not file an informal claim for benefits for peripheral neuropathy in 1978. *See Hersey*, 2 Vet.App. at 94.

---

[10] 

Whether a claimant's blanket statement that he or she is seeking service connection for "all disabilities of record," in isolation, may trigger the Secretary's section 5102(b) duty to notify the claimant of the incomplete nature the application was not argued by the appellant, and consequently is not an issue that the Court need address at this juncture. *See* 38 U.S.C. § 5102 (providing that if a claimant's application is incomplete, "the Secretary shall notify the claimant and the claimant's representative, if any, of the information necessary to complete the application"); *see* 38 C.F.R. § 3.159(a)(3) (defining a "substantially complete application" for benefits as one that, inter alia, identifies "the benefit claimed and any medical condition(s) on which it is based").

## B. An Informal Claim for Benefits for Peripheral Neuropathy
### Based on the Appellant's 1989 Application

The appellant makes an alternative argument. He contends that he is entitled to an earlier effective date because he filed an informal claim for benefits for peripheral neuropathy when he submitted his 1989 application for VA benefits. Appellant's Br. at 14-19. The appellant argues further that his February 1994 correspondence in which he stated that he was filing a claim for service connection for peripheral neuropathy should not be considered a new claim for benefits based on that disorder but that it should instead be considered as "additional correspondence" pertaining to the 1989 claim, which was pending at the time that he submitted his February 1994 correspondence. *Id*. at 18.

The Court is not persuaded by the appellant's arguments. In the 1989 application for benefits, the appellant indicated that he was seeking service connection for "severe peripheral vascular disease." R. at 311. The Board found that the appellant's 1989 application did not raise a claim for peripheral neuropathy. R. at. 19-20. Rather, the Board found that the appellant did not file a claim for peripheral neuropathy until February 1994 when his attorney notified the RO that the appellant was seeking service connection for that disorder. *Id*.

The appellant's 1989 application makes no reference to peripheral neuropathy. It appears that when the appellant filed his 1989 claim for benefits for peripheral vascular disease he did so on the basis of the contemporaneous medical diagnoses that he had received from his physicians at that time. The medical records the appellant submitted in conjunction with his 1989 application reflect that the appellant was uniformly and consistently diagnosed by his treating physicians with peripheral vascular disease. R. at 319-22. Notably, peripheral neuropathy is not mentioned in any of the medical reports submitted by the appellant in support of his 1989 application. *Id*. Indeed, none of the medical reports submitted in conjunction with the 1989 application even suggests that the appellant had *any* neurological disorder at that time.

By contrast, in February 1994, when the appellant notified the RO that he was seeking service connection for peripheral neuropathy, he provided the RO with medical reports containing diagnoses of peripheral neuropathy. As the Board correctly determined, the record shows that the appellant was first diagnosed with peripheral neuropathy in 1993. R. at 20. The record further reveals that it

14

was not until 1993 that the appellant's doctors concluded that he suffered from both peripheral vascular disease and peripheral neuropathy. In fact, the appellant stated that it was on the basis of the new diagnosis of peripheral neuropathy that he filed his February 1994 claim. R. at 373-75, 426. Although a medical diagnosis is not necessary to initiate a claim, it was not until February 1994 that the appellant provided the RO with sufficient information to identify compensation for peripheral neuropathy as the benefit that he was seeking. *See Boggs*, 520 F.3d at 1356; *Clemons*, *supra*.

In summary, the Court is not firmly convinced that the Board erred in finding that February 1994 was the first time that the appellant notified the RO that he was seeking service connection for peripheral neuropathy. *See Hersey*, 2 Vet.App. at 94. The Court agrees with the Board that the appellant's February 1994 correspondence constituted a claim for benefits based on peripheral neuropathy. The February 1994 correspondence is the earliest document in the record that satisfied all three requirements for an informal claim for disability compensation for peripheral neuropathy. The communication is written; it indicates an intent to file a claim for benefits; and it identifies the benefit sought by the appellant as peripheral neuropathy. For this reason, the Court rejects the appellant's argument that his February 1994 correspondence was not a new claim but merely additional correspondence pertaining to the pending 1989 claim for benefits based on peripheral vascular disease. Because the Court is not firmly convinced that the Board erred in concluding that the appellant's 1989 claim was limited to one seeking benefits based on peripheral vascular disease, the appellant's February 1994 correspondence was not in furtherance of his 1989 claim; rather, it raised a new claim for benefits for peripheral neuropathy.

## III. CONCLUSION

After consideration of the appellant's and the Secretary's briefs, and a review of the record on appeal, the Board's January 11, 2007, decision is AFFIRMED.

15