# UNITED STATES COURT OF APPEALS FOR VETERANS CLAIMS

No. 21-6249

Mai De Hart, Appellant,

v.

Denis McDonough,
Secretary of Veterans Affairs, Appellee.

On Appeal from the Board of Veterans' Appeals

(Argued November 15, 2023                    Decided July 23, 2024)

*Kaitlyn Degnan*, with whom *Brittani L. Howell* was on the brief, both of Providence, Rhode Island, for the appellant.

*Colin M. Rettammel*, with whom *Catherine C. Mitrano*, Acting General Counsel; *Mary Ann Flynn*, Chief Counsel; *Christopher W. Wallace*, Deputy Chief Counsel; and *Sharity W. Bannerman*, were on the brief, all of Washington, D.C., for the appellee.

Before PIETSCH, TOTH, and JAQUITH, *Judges*.

TOTH, *Judge*, filed the opinion of the Court. JAQUITH, *Judge*, filed a dissenting opinion.

TOTH, *Judge*: Air Force veteran Mai De Hart filed a Notice of Disagreement (NOD) in 2009 as to a regional office (RO) decision that assigned a noncompensable rating for a spine disability. The appeal has been in process ever since and includes a remand from the Board in 2017. During development of the appeal on remand, Ms. De Hart was noted to be experiencing radiculopathy related to the spine condition in both legs. Taking account of this evidence, the RO issued a 2019 decision that—in addition to assigning a higher staged rating for the spine disability—granted service connection for bilateral lower extremity radiculopathy and assigned separate ratings and effective dates. Ms. De Hart did not file an NOD as to this decision. The spine rating issue returned to the Board, which issued the June 2021 decision now on appeal.

In its discussion of her spine rating, the Board noted that she had been awarded compensation for radiculopathy in each leg, but it did not discuss any aspect of that award, including whether earlier effective dates were warranted. Ms. De Hart contends that the issue of an earlier effective date for her right leg radiculopathy was before the Board in 2021 by virtue of the 2009 NOD because, as a neurological complication, radiculopathy must always be considered

part and parcel of her spine condition. Thus, she argues that the Board should have addressed whether she was entitled to an earlier effective date for right leg radiculopathy based on the evidence of record.

We reach a different conclusion, namely, that once radiculopathy is recognized by VA as a distinct service-connected disability with its own rating criteria, it is subject to the same general rules that would govern the appeal of any other separately adjudicated issue. To that end, we hold that, although neurological complications secondary to a spine condition claim must be considered and properly compensated by VA when they are raised by a veteran or reasonably raised by the record, they do not as a legal matter remain part and parcel of the spine claim once they have been separately addressed and adjudicated in a VA decision. And because the veteran did not file an NOD as to the effective date for right leg radiculopathy assigned by the RO in its 2019 decision, the issue was not before the Board in June 2021, and the Board had no obligation to address it. This result follows naturally from our caselaw, which regards "downstream" issues that have yet to be decided as beyond the scope of an NOD that appeals an "upstream" issue. *Grantham v. Brown*, 114 F.3d 1156 (Fed. Cir. 1997); *Jarrell v. Nicholson*, 20 Vet.App. 326 (2006) (en banc).

In so holding, we are mindful of the judgment reached in *Chavis v. McDonough*, 34 Vet.App. 1 (2021). But that case turned on the circumstance-specific manner by which VA developed and adjudicated Mr. Chavis's spine condition claim; *Chavis* did not purport to answer a general legal question. And as a rule, we conclude that distinct and separately evaluated neurological complications do not remain part and parcel of the underlying spine condition claim for appellate purposes. Accordingly, because the Board didn't err in not addressing right leg radiculopathy as part of the higher spine rating issue, we affirm the Board decision in that respect.[1]

## I. BACKGROUND

Ms. De Hart served in the Air Force for 28 years, including 10 years of foreign service in support of various combat efforts. Just prior to her retirement in 2008, she applied for VA benefits for multiple conditions, including "Grade II Spondylosis L5-S1"—a spine condition. R. at 4208. During development of her spine condition claim, she underwent a VA exam in which the

---

[1] The Court concludes that the remaining arguments raised in Ms. De Hart's appeal—relating to higher ratings for her spine condition and for PTSD—do not merit resolution by a panel. Those matters are addressed in a single-judge memorandum decision issued contemporaneously with this panel decision.

2

examiner noted an impression of "spondylolisthesis with low back and radiating pain to the right leg. Evidence of a S1 radiculopathy." R. at 3383. In December 2008, the RO issued a rating decision that, among other things, granted service connection for the spine and assigned a 0% rating under diagnostic code (DC) 5239 (Spondylolisthesis or segmental instability) effective February 1, 2008. 38 C.F.R. § 4.71a (2008). In February 2009, she submitted an NOD contesting many, but not all, of the RO's determinations in the 2008 rating decision. She wrote "[m]y specific area of disagreement is as follows" and, as relevant here, stated: "Lumbar spondylolisthesis Grade II I am having severe problems with this condition and it should be evaluated higher." R. at 2377.

In March 2011, the RO issued a Statement of the Case (SOC) continuing the 0% evaluation of her spine condition. In response, she submitted a Substantive Appeal contesting all decisions within the SOC. While her appeal was pending before the Board, the RO ordered a new back conditions exam, the result of which prompted the RO to increase her spine rating to 10%, effective April 2016 (the date of the exam). In 2017, the Board decided the issues on appeal for the first time. Relevant here, it remanded the issues of higher ratings for her spine condition (both a compensable rating prior to April 2016 and higher than 10% thereafter) to obtain private treatment records.

When the spine claim was once again before the RO, VA obtained a new exam in 2019. During this exam, the veteran reported constant pain radiating down both legs. The examiner noted an impression of moderate right and left lower extremity radiculopathy, which the examiner stated was "a progression of [her] service connected back condition." R. at 1056. Based on that exam, the RO issued a new rating decision in September 2019 that did two things. First, the RO increased Ms. De Hart's spine condition rating to 20%, effective March 2019 (again, the date of the exam). Next, it found that "[s]ervice connection for . . . radiculopathy has been established as related to the service-connected disability of lumbar spondylolisthesis" and granted 20% ratings for radiculopathy for each leg, effective March 2019. R. at 1029. Notice of the award and of the veteran's appellate rights accompanied the rating decision. R. at 1015–17. The RO then issued a Supplemental SOC (SSOC), listing the issues for consideration as entitlement to a compensable rating for the spine condition prior to 2016, in excess of 10% from April 2016 to March 2019, and in excess of 20% from March 2019. The SSOC denied a higher rating during all of these periods.

3

The spine condition rating automatically returned to the Board,[2] which issued the decision on appeal, continuing an initial noncompensable rating, a 10% rating from 2016 to 2019, and a 20% rating thereafter. Near the end of its discussion of the spine issue, the Board noted that "the RO assigned separate ratings for right and left lower extremity radiculopathies in a September 2019 rating decision related to the lumbar spine disability. The evidence of record does not indicate the presence of any additional objective abnormalities for which a separate rating is warranted." R. at 17. It did not further discuss any aspect of Ms. De Hart's radiculopathies nor did it list those issues among the issues considered. She appealed.

## II. ANALYSIS

VA provides two methods for evaluating and compensating spine conditions. The first, and more common, is the General Rating Formula for Diseases and Injuries of the Spine; the second is the Formula for Rating Intervertebral Disc Syndrome Based on Incapacitating Episodes. *See* 38 C.F.R. § 4.71a (2024). Ms. De Hart is rated under the first method. The General Rating Formula assigns ratings based on a number of criteria focusing principally on the location, severity, and type of limitation of motion of the spine a veteran suffers, regardless of whether symptoms such as pain, stiffness, or aching are present. *Cullen v. Shinseki*, 24 Vet.App. 74, 80 & n.1 (2010). Note (1) to the General Rating Formula instructs: "Evaluate any associated objective neurologic abnormalities, including, but not limited to, bowel or bladder impairment, separately, under an appropriate diagnostic code." The RO followed this instruction by assigning Ms. De Hart separate 20% ratings for moderate incomplete paralysis of the sciatic nerves. *See* 38 C.F.R. § 4.124a, Diagnostic Code 8520 (2024).

### A. *Arguments*

There is no dispute that VA was correct to assign additional ratings for the veteran's radiculopathy in both legs. The parties disagree instead over whether the veteran's right leg radiculopathy effective date was part of the spine appeal that returned to the Board, such that the Board should have addressed it in its decision.

---

[2] Under the legacy system—which includes all cases not governed by the Veterans Appeals Improvement and Modernization Act of 2017 and its implementing regulations, *Mattox v. McDonough*, 34 Vet.App. 61, 68 (2021)— a case remanded by the Board automatically returns to the Board after issuance of an SSOC unless "all benefits sought on appeal" have been granted. 38 C.F.R. § 19.38 (2024); *see Holland v. Brown*, 9 Vet.App. 324, 328 (1996).

According to Ms. De Hart, *Chavis* already held that neurological abnormalities should always be considered part of the underlying spine claim, including in the appellate context. And even if *Chavis* turned principally on the specific facts of the case, she urges us to issue such a universal holding now. She first relies on regulations and caselaw generally pertaining to claim construction—that is, how VA must interpret the scope of a claim. She observes that, under 38 C.F.R. § 3.155(d)(2), VA must adjudicate "entitlement to benefits for the claimed condition as well as entitlement to any additional benefits for complications of the claimed condition"; and she argues that, under *Bailey v. Wilkie*, 33 Vet.App. 188 (2021), VA must adjudicate service-connection claims for "complications" of a primary condition regardless of whether a veteran explicitly claimed entitlement to such benefits. She also relies heavily on TDIU-specific caselaw to contend that all aspects of spine-related neurological complications remain part and parcel of the spine claim and travel with that claim wherever its adjudicatory journey takes it. Under this TDIU-infused theory, the Board was "obligated to address [her] entitlement to separate ratings for the neurological manifestations for the entire appeal period" when the spine rating issue returned to it following its remand. Appellant's Supp. Br. at 10. And if that was so, Ms. De Hart asserts, no new NOD was required because there need be "only be one jurisdiction-conferring NOD"—which she filed in 2009—and because "[t]he RO's subsequent award of a separate rating for radiculopathy in 2019 did not remove the issue from appellate status because it was not a full grant of benefits." *Id.* at 8, 9 (citing *Hamilton v. Brown*, 39 F.3d 1574 (Fed. Cir. 1994), and *Harper v. Wilkie*, 30 Vet.App. 356 (2018)).

The Secretary sees things differently. First, as for *Chavis*, he asserts that the Court "was careful to limit its holding to the unique factual and procedural circumstances of Mr. Chavis's case." Secretary's Supp. Br. at 2–3. Second, and more broadly, the Secretary contends that this case is not about claim construction and initial adjudication but instead about how a claim is placed in appellate status. And he contends that longstanding precedent such as *Grantham* and *Jarrell* establish that an NOD as to an upstream issue cannot place a downstream issue into appellate status. In other words, "an NOD 'cannot express disagreement with an issue that has not been decided.'" Secretary's Supp. Br. at 6 (quoting *Vargas-Gonzales v. Principi*, 15 Vet.App. 222, 228–29 (2001)). He maintains that neurological complications cannot remain part and parcel of the underlying spine disability in perpetuity and that, once neurological complications are identified

5

and adjudicated, a veteran must file an NOD as to any aspect of that adjudication with which she disagrees to initiate appellate proceedings.

## B. Chavis*'s Import*

Of course, we would be bound to follow *Chavis* if it had resolved the issue before us. *See Rouse v. McDonough*, 34 Vet.App. 43, 49 (2021). Instead, the Court stated clearly that it was "leav[ing] for another day the question whether issues of higher evaluations for radiculopathy are always part of claims seeking higher evaluations for the underlying spine disability." *Chavis*, 34 Vet.App. at 15 n.17. *Chavis* took a fact-specific approach to resolving the appeal, focusing primarily on the manner in which VA developed and adjudicated the spine and related radiculopathy matters—including the fact that the Board assumed appellate control over the radiculopathy ratings and issued a favorable decision increasing them. *See id.* at 15–16. *Chavis*, in other words, accepted as given "VA's consideration of Mr. Chavis's neurologic manifestations as part of the claim seeking higher compensation for the lumbar spine disability" and concluded that neither caselaw nor VA's internal procedural guidelines prohibited the RO or the Board from doing so. *Id.* at 16–17 (noting repeatedly that VA's actions were "consistent with" both authorities).

Thus, *Chavis* did not purport to resolve the legal question of whether neurological complications of an underlying spine claim always remain part of the underlying spine claim. We must do so now.

## C. *Claim Construction and Initial Adjudication Versus Appellate Status*

The parties' disagreement over the answer to that legal question stems from their reliance on statutes, regulations, and caselaw from different contexts. Ms. De Hart's argument relies heavily on caselaw regarding claim construction, such as how VA must interpret the scope of claims and when it must address and adjudicate reasonably raised claims or issues. In particular, she invokes caselaw specific to TDIU to drive home her point that certain matters should always remain bundled together. The Secretary, in turn, argues that the most relevant legal standards pertain to how a claim or issue is placed in appellate status. These contexts, though related, are governed by distinct principles.

*Claim construction and initial adjudication*. When a veteran files a claim for benefits, several VA duties arise, including the duty to assist the claimant in developing a claim and its various specific obligations, 38 U.S.C. § 5103A(a)(1), and the more generalized duty to "render a decision which grants every benefit that can be supported in law," 38 C.F.R. § 3.103(a) (2024).

Proceeding from these obligations is the duty to discuss and take appropriate action on all issues and theories explicitly raised by the claimant or reasonably raised by the record. *See Urban v. Principi*, 18 Vet.App. 143, 145 (2004); *Brannon v. West*, 12 Vet.App. 32, 35 (1998); *see also Robinson v. Peake*, 21 Vet.App. 545, 555 (2008), *aff'd sub nom. Robinson v. Shinseki*, 557 F.3d 1355 (Fed. Cir. 2009).

VA must read a claimant's pleadings "sympathetically" and "generously" to identify all potential claims for benefits that a claimant may reasonably be understood to be seeking. *Shea v. Wilkie*, 926 F.3d 1362, 1368 (Fed. Cir. 2019). And "while a pro se claimant's 'claim must identify the benefit sought,' the identification need not be explicit in the claim-stating documents but can also be found indirectly through examination of evidence to which those documents themselves point when sympathetically read." *Id.* VA "need not 'conduct an unguided safari through the record to identify all conditions for which the veteran may possibly be able to assert entitlement to a claim for disability compensation.'" *Id.* at 1368–69 (quoting *Brokowski v. Shinseki*, 23 Vet.App. 79, 89 (2009)). "But in deciding what disabilities, conditions, symptoms, or the like the claim-stating documents are sympathetically understood to be identifying, VA must look beyond the four corners of those documents when the documents themselves point elsewhere," such as "medical records." *Id.* at 1369.

The duty to assist requires VA, as it develops evidence, to identify and adjudicate issues, and even entire claims, that are reasonably raised by the record generated through adjudication of an initial claim. *Bailey*, 33 Vet.App. at 203; *see Sellers v. Wilkie*, 965 F.3d 1328, 1338 (Fed. Cir. 2020) (observing that "the Secretary's duty to assist begins upon receipt" of a "legally sufficient" claim, that is, a claim that identifies "the sickness, disease, or injuries for which compensation is sought, at least at a high level of generality"). These duties reflect the pro-claimant nature of veterans law and acknowledge that it "is the Secretary who knows the provisions of title 38 and can evaluate whether there is potential under the law to compensate an averred disability based on a sympathetic reading of the material in a pro se submission." *Ingram v. Nicholson*, 21 Vet.App. 232, 256–57 (2007).

TDIU occupies an idiosyncratic place in rules and caselaw governing the claim construction and adjudication context. A veteran *can* file a "freestanding claim" for TDIU but need not do so, because TDIU is never the source of "a separate claim for benefits." *Rice v. Shinseki*, 22 Vet.App. 447, 453–54 (2009). Rather, TDIU serves as another pathway "to obtain an *appropriate*

7

*rating* for a disability or disabilities, either as part of the initial adjudication of a claim or . . . as part of a claim for increased compensation." *Id*. (emphasis added). This is so because a veteran whose service-connected condition later causes unemployability "has logically undergone an increase in disability." *Dalton v. Nicholson*, 21 Vet.App. 23, 33 (2007). In other words, granting entitlement to TDIU, whether it be schedular or extraschedular, acknowledges that the veteran's earning capacity has been reduced to zero, even though she may not be entitled to a 100% schedular rating for her service-connected disability.

And, just as VA is required to treat an application for TDIU as a request for a higher rating for a veteran's disability or disabilities, so too can a request for a higher rating raise the issue of entitlement to TDIU when there is evidence of unemployability in the record. *See Comer v. Peake*, 552 F.3d 1362, 1367 (Fed. Cir. 2009). Unlike a typical service-connection claim (be it primary or secondary), TDIU cannot exist on its own—it is inextricably tied to the proper rating of the service-connected condition claim or claims to which it attaches. And it is this interconnectedness that led this Court to conclude in *Harper v. Wilkie*, 30 Vet.App. 356 (2018), that an NOD that placed an increased-rating matter into appellate status also placed a later-identified issue of TDIU into appellate status (more about this below). In all other contexts, "separate claims are," for all adjudicative intents and purposes, "separate." *Tyrues v. Shinseki*, 26 Vet.App. 31, 35 (2012) (en banc) (Lance, J., concurring in part and dissenting in part). "The law is clear," in other words, "that claims for secondary service connection are not claims for increased compensation and are not part and parcel of a claim for increased compensation for the primary condition." *Gudinas v. McDonough*, 34 Vet.App. 25, 37 (2021), *aff'd*, 54 F.4th 716 (Fed. Cir. 2022).

*Appellate status*. In the last few years, VA's administrative appeals process has undergone significant changes through the adoption and implementation of the Veterans Appeals Improvement and Modernization Act of 2017 (AMA). However, this decision involves the legacy system, under which appellate review of a claim is "initiated by a notice of disagreement and completed by a substantive appeal after a statement of the case is furnished." 38 U.S.C. § 7105(a) (2012). The Board has a duty to determine the scope of an NOD, again through a sympathetic reading of the NOD document and surrounding circumstances. *See Murphy v. Wilkie*, 983 F.3d 1313, 1319 (Fed. Cir. 2020); *see also Rivera v. Shinseki*, 654 F.3d 1377, 1380 (Fed. Cir. 2011). A general or vague NOD may be broad enough to initiate an appeal of the entire rating decision, whereas a specific NOD may narrowly limit the appeal to the specific matters

8

mentioned. *See Collaro v. West*, 136 F.3d 1304, 1309–10 (Fed. Cir. 1998); *Ledford v. West*, 136 F.3d 776, 780 (Fed. Cir. 1998); *Buckley v. West*, 12 Vet.App. 76, 82–83 (1998).

The Board's duty to read an NOD generously, however, does not dislodge the longstanding rule that an NOD as to an upstream issue cannot place a downstream issue into appellate status. *See Grantham*, 114 F.3d at 1161. Downstream issues are those contingent on the initial grant of entitlement, like evaluation level and effective date. In other words, the assignment of an effective date "does not become relevant until VA grants the benefit sought." *Young v. Shinseki*, 25 Vet.App. 201, 204 (2012). *Grantham*'s holding makes sense; an NOD cannot place a claim before the Board that "was never presented to and adjudicated by the RO because there is no decision on such a newly raised claim to appeal to the Board." *Jarrell*, 20 Vet.App. at 331. Put differently, "a claimant's NOD cannot express disagreement with an issue that has not been decided." *Vargas-Gonzalez*, 15 Vet.App. at 228–29. Critically, these cases make clear that, once the RO eventually decides any downstream issues, the veteran must file a new NOD. *See Holland v. Gober*, 10 Vet.App. 433, 436 (1997) (holding that an RO's grant of service connection during the appellate process is "a full award of benefits on the appeal initiated by [the first] NOD" and any disagreement with the rating or effective date required a new NOD for those issues to be placed in appellate status); *see also Urban*, 18 Vet.App. at 145 ("To the extent that [the appellant] is arguing that the Board must assign, sua sponte, an effective date once it awards a rating of TDIU on appeal from an RO decision, such an argument is unavailing unless an NOD is then of record as to the downstream issue of an effective date for the assignment of that rating."). And, though this rule may appear burdensome—a claimant must be aware of the need for a new NOD and timely file— it also ensures that claimants maintain agency over the issues for which they seek review.

As in the initial claim construction and adjudication process, TDIU is unique in the appellate context. Because TDIU remains part of an initial claim or a claim for an increased rating, there are special rules as to how TDIU is placed into appellate status. In *Harper*, the veteran submitted an NOD as to a PTSD rating assigned by the RO in 2008 and, while his PTSD appeal was pending, applied for TDIU. 30 Vet.App. at 357–58. The PTSD appeal was still pending in 2016 when the RO granted entitlement to TDIU and assigned a 2016 effective date. When the Board later adjudicated the PTSD appeal, it found that the issue of TDIU was not before it because Mr. Harper hadn't initiated appellate proceedings as to the 2016 RO decision. The Court held that, once the veteran submitted a TDIU application, the issue of TDIU became part of the underlying

9

PTSD rating matter such that it was in appellate status by virtue of the 2008 NOD that appealed the PTSD rating. Moreover, we said that the intervening RO decision could not bifurcate TDIU from the PTSD claim because TDIU "became part and parcel of the underlying PTSD claim and the RO's grant of TDIU served only as a partial grant of his request for TDIU." *Id.* at 359. Because the issue of TDIU was in appellate status by way of the 2008 NOD, the Board was obliged to address it.

The sui generis nature of TDIU cannot be emphasized enough. Many claimants have tried to equate TDIU with other forms of compensation like secondary service-connection claims. But this Court and the Federal Circuit have repeatedly rejected those attempts. In *Ross v. Peake*, 21 Vet.App. 528, 532 (2008), for example, we held that an award of secondary service connection is not an award of "increased compensation" and not analogous to TDIU (another form of an award of increased compensation) because "the latter demonstrates a worsening of the *underlying* condition and not the incurrence of an *additional* disability." Likewise, the Federal Circuit in *Manzanares v. Shulkin*, 863 F.3d 1374, 1378 (Fed. Cir. 2017), went further to hold that "secondary service connection is not part of a primary claim for service connection. . . . By its plain terms, [38 C.F.R. § 3.310(a)] does not mean that a *claim* for secondary service connection is treated as part of the primary claim for service connection (or a claim for increased rating for the primary condition)." And most recently, in *Gudinas*, 34 Vet.App. at 35, we reiterated *Ross*'s reasoning, noting that the Court had "already rejected" the veteran's attempt to equate a secondary condition to TDIU—that is, to treat a claim for secondary service connection as a claim for increased compensation with respect to the primary condition.

In sum, how a claim is construed, developed for initial adjudication purposes, and placed in appellate status are related but nonetheless distinct concepts. In construing a claim, the law requires VA to sympathetically identify and adjudicate certain issues and perhaps additional claims based on the pleadings and evidence before it, guided by the principle that a veteran might not realize the full scope of benefits to which she may be entitled under the relevant law. But once claims and issues are properly identified and adjudicated, and the veteran receives notice of VA's decision (or decisions) on those matters and of applicable appellate rights, the veteran has an opportunity to choose which matters to appeal, if any. (Notably, in the AMA system, this choice of appellate avenue becomes far more important as that system offers different lanes through which a veteran may appeal.) And though the Board has a duty to liberally construe a veteran's pleadings,

including the scope of an NOD, the Board may not reach out and exercise review over a matter not placed into appellate status.

## D. *Application*

It is against this backdrop that Ms. De Hart contends that an appeal seeking a higher rating for the primary spine condition encompasses all of the downstream issues pertaining to the separate (and much later) award of compensation for radiculopathy, such that the NOD as to the spine condition placed the issue of her right leg radiculopathy's effective date before the Board. In doing so, she argues that TDIU-related concepts and caselaw, the instructions for rating neurological complications in Note (1) to the General Rating Formula, and VA's duty to compensate "complications" related to a condition under § 3.155(a) make neurological complications permanently part and parcel of the underlying spine condition in the appellate context. As explained below, we find no merit in this argument.

The first problem with the argument is that TDIU is unique, and the caselaw pertaining to it cannot simply be grafted onto the context of this case. Where the issue of entitlement to TDIU is raised, TDIU "is *not* a separate claim for benefits but rather involves an attempt to obtain an appropriate rating for a disability or disabilities." *Rice*, 22 Vet.App. at 453–54 (emphasis added). In contrast, a secondarily service-connected condition is not part and parcel of the underlying primary condition. *Gudinas*, 34 Vet.App. at 37. Arguments equating secondary conditions— separate awards of compensation—with TDIU or, more broadly, with higher ratings for the primary condition generally have been repeatedly rejected. *See id.* at 35; *see also, e.g.*, *Manzanares*, 863 F.3d at 1378; *Ross*, 21 Vet.App. at 528.

Ms. De Hart attempted to distinguish her case from *Ross* and *Gudinas*, arguing that her radiculopathy is not a secondary condition but is a separately rated symptom of a single spine condition.[3] But this argument is belied by VA's treatment of her radiculopathy; it rated the condition as secondary to her spine condition and cited 38 C.F.R. § 3.310, which governs secondary service connection, R. at 1029.

Significantly, neither Note (1) to the General Rating Formula nor § 3.155(a) supports the contention that neurological complications remain part and parcel of an underlying spine condition claim even after service connection has been awarded for the former. Indeed, Note (1) specifically

---

[3] Oral Argument at 9:30–10:20, https:// www.youtube.com/watch?v=yl2G-PFhZVs&t=6s.

11

directs adjudicators to "[e]valuate any associated objective neurologic abnormalities . . . *separately*, under an appropriate diagnostic code." 38 C.F.R. § 4.71a (emphasis added). This takes adjudicators away from the General Rating Formula in § 4.71a and into—as relevant here—the rating schedule for neurological conditions and convulsive disorders found in § 4.124a. VA has explained that this is necessary because of the "great variety of neurologic disabilities [that] might stem from diseases and injuries of the spine." 67 Fed. Reg. 56,509, 56,510 (Sept. 4, 2002) (proposed rule). The rating assigned for neurological complications has no bearing on the rating for the underlying spine condition, and vice versa. Even if Ms. De Hart's underlying spine condition was assigned a 0% rating based on the criteria of the General Rating Formula, she would still be entitled to 20% ratings for the radiculopathy present in both legs. In short, Note (1) does not suggest that spine-related neurological problems, *once adjudicated and separately rated*, continue to be treated as part and parcel of the underlying spine condition.[4]

Nor is § 3.155 of assistance to the veteran's argument. That regulation provides in relevant part that, once a claim is filed, "VA will also consider all lay and medical evidence of record in order to adjudicate entitlement to benefits for the claimed condition *as well as entitlement to any additional benefits for complications of the claimed condition*, including those identified by the rating criteria for that condition." 38 C.F.R. § 3.155(d)(2) (2024) (emphasis added). In *Bailey*, we concluded that the term "complications" in § 3.155(d)(2) included disabilities caused or aggravated by a service-connected disability. 33 Vet.App. at 200. According to Ms. De Hart, this means that "a neurological manifestation of a spine disability is a complication of that disability and is part and parcel of a claim for the spine disability." Appellant's Supp. Br. at 4. But *Bailey* was clear that this provision obligates VA to "*develop and adjudicate* claims for secondary service connection that are reasonably raised during the processing of a properly initiated claim as to the primary service-connected disability's evaluation level." 33 Vet.App. at 202 (emphasis added). *Bailey* did not purport to comment on the status of the complication once it had been properly identified,

---

[4] This point is confirmed by the *VA Adjudication Procedures Manual* (M21-1). In relevant part, it recognizes the connection between a spine condition and related neurological problems and gives adjudicators special instructions, but all of those instructions pertain to the *initial* adjudication of neurological problems. Thus, adjudicators are instructed that the "*onset* of a neurological complication represents medical progression or worsening of the spinal disease"; that "a claim asserting *new complications* of spinal disease is a claim for increase rather than a claim for secondary [service connection]"; and that, "[w]hen assigning effective dates for *new neurological spinal complications*, consider effective date provisions specifically for increases." M21-1, Pt. V, sbpt. iii, ch. 1, sec. B.3.d (emphasis added) (last updated April 25, 2022). None of these provisions indicate that neurological complications should be considered part and parcel of the underlying spine condition for appellate purposes.

12

adjudicated, and (where appropriate) separately rated. *Bailey* addresses when, under § 3.155(d)(2), VA must identify and adjudicate entitlement to complications of a claimed condition as part of the Agency's initial claim-processing obligations to construe the scope of a claim and thereafter develop it. Neither the case, nor § 3.155 more broadly, addresses how separately adjudicated and rated complications are placed into appellate status.

In this case, VA's duty with respect to spine-related neurological problems was satisfied when, as part of its development on remand from the Board of the underlying spine claim, it identified the radiculopathy, determined its etiology to the spine condition, adjudicated and granted entitlement to service connection, and assigned compensation ratings based on distinct criteria, as well as effective dates. At that point, each spine-related radiculopathy rating assumed its own adjudicative identity. If dissatisfied with the ratings or effective dates assigned, the veteran was free to challenge them through an appeal to the Board, as the notice of appellate rights accompanying the 2019 RO rating decision stated. In the absence of such an appeal here, the Board ensured that the Agency's duties to Ms. De Hart had been satisfied by noting that the 2019 RO decision awarded radiculopathy compensation and that "the evidence of record [did] not indicate the presence of any additional objective neurologic abnormalities for which a separate rating is warranted." R. at 17.

Under the general procedural rules discussed above, Ms. De Hart's 2009 NOD could not have placed any aspect of the radiculopathy compensation award in appellate status when the matter was neither identified nor adjudicated by the RO until a decade after the NOD was filed. *See Grantham*, 114 F.3d at 1161; *Jarrell*, 20 Vet.App. at 331; *Vargas-Gonzalez*, 15 Vet.App. at 228–29. We see no legal justification for treating neurological complications of a spine condition differently than any other condition for which compensation has been granted on a secondary basis. Accordingly, we hold that Ms. De Hart's 2009 NOD did not place the issue of the proper effective date for right leg radiculopathy in appellate status, such that it was error for the Board not to address it. To seek Board review of that issue, the veteran was obliged to file a timely NOD as to the 2019 rating decision.

However, we note that Ms. De Hart is not without remedy. Although she may no longer file an NOD to the RO's 2019 radiculopathy decision, she may file a motion to revise that decision or the 2008 RO decision based on clear and unmistakable error (CUE) and cite the evidence that

13

she believes indicates entitlement to an earlier effective date for right leg radiculopathy. (We offer no opinion on the merits of such a CUE motion.)

## III. OTHER MATTERS

As mentioned at the outset, this panel decision addresses only the portion of Ms. De Hart's appeal pertaining to whether the Board erred by failing to address the radiculopathy issue. A separate nonprecedential single-judge memorandum decision issued contemporaneously with this panel decision addresses the portions of the veteran's appeal seeking higher ratings for her spine condition and PTSD because—at this stage, at least—the panel has concluded that resolution of those matters in a precedential decision is neither necessary nor appropriate. As we recently noted in *Jackson v. McDonough*, 37 Vet.App. 87, 95–96 (2023), "this type of bifurcated approach to an appeal is not novel in the federal appellate system," even if it is in this Court. *Jackson* explains how the parties may exercise their rights to seek further review from this Court or from the Federal Circuit in this new procedural context, *id.* at 96, and we have nothing to add to that careful explanation. If need be, a party unsure of how to proceed may file a motion seeking clarification on that point.

## IV. CONCLUSION

To the extent that the June 9, 2021, Board decision did not address the effective date assigned for right leg radiculopathy compensation, the Court discerns no error and AFFIRMS that aspect of the decision. The panel is dissolved for the remaining issues from the Board decision and they will be addressed in the separate single judge decision.

JAQUITH, *Judge*, dissenting: It is a foundational principle of this Court that "a panel may not render a decision which conflicts materially with [an] earlier panel . . . opinion"; only the en banc Court may do so. *Bethea v. Derwinski*, 2 Vet.App. 252, 254 (1992); *see Rouse v. McDonough*, 34 Vet.App. 43, 49 (2021). In my view, the majority in this case violates that venerated principle by forsaking the precedential panel opinion in *Chavis v. McDonough*, 34 Vet.App. 1 (2021), so I respectfully dissent.

14

*Stare Decisis*

The majority circumvents *Chavis* by characterizing it as factbound, *ante* at 2, 6, but the majority so loudly echoes the dissent in *Chavis* that the material conflict between the two is impossible to miss. In *Chavis*, as in this case, the veteran had filed an NOD with the evaluation of his lumbar spine disability but not with a separate rating of his radiculopathy. 34 Vet.App. at 14. The Secretary argued that the Board therefore had no jurisdiction over the radiculopathy evaluations and the veteran argued that the Board had jurisdiction because the radiculopathy evaluations were part of his lumbar spine disability claim. *Id.* The Court agreed with the veteran, holding that "Mr. Chavis's radiculopathy was part of his claim seeking higher compensation for his lumbar spine disability." *Chavis*, 34 Vet.App. 16. Judge Meredith dissented because Mr. Chavis's NOD with VA's decision on his lumbar spine disability could not have placed into appellate status the downstream issue of the proper rating for radiculopathy, and neither Note (1) to the General Rating Formula,  nor 38 C.F.R. § 3.155, nor *Bailey v. Wilkie*, 33 Vet.App. 188 (2021), nor TDIU caselaw gave the Board jurisdiction over radiculopathy. *Id.* at 19-24. Today, the majority embraces each aspect of that *Chavis* dissent. *See, e.g., ante* at 8-13.  The circumstances in this case are not meaningfully different from those in *Chavis*. Though it is true that the *Chavis* majority left "for another day the question whether issues of higher evaluations for radiculopathy are always part of claims seeking higher evaluations for the underlying spine disability," 34 Vet.App. at 15 n. 17, that footnote does not render the *Chavis* opinion nonprecedential and is not a license to reverse it in the nearly identical circumstances here. And that is what is happening. Under the guise of addressing an unanswered question, the majority opinion is nullifying the *Chavis* holding and elevating the *Chavis* dissent. If that flip-flop is warranted, it must be accomplished by the en banc Court.

"Stare decisis—'the idea that today's Court should stand by yesterday's decisions'—is 'a foundation stone of the rule of law.'" *Ravin v. Wilkie*, 31 Vet.App. 104, 118 (2019) (Falvey, J., dissenting) (quoting *Kimble v. Marvel Ent.*, 576 U.S. 446, 455 (2015)). From its very beginnings, our Court has noted that judicial review of veterans' claims is built on the stare decisis cornerstone based on "the binding effect of this Court's published opinions as precedent in pending and future cases." *Harrison v. Derwinski*, 1 Vet.App. 438, 438 (1991) (citing *Webster v. Reproductive Health Services*, 492 U.S. 490, 518 (1989)). Stare decisis "promotes the evenhanded, predictable, and consistent development of legal principles, fosters reliance on judicial decisions, and contributes

15

to the actual and perceived integrity of the judicial process." *Payne v. Tennessee*, 501 U.S. 808, 827 (1991). Therefore, a "'special justification' [] over and above the belief 'that the precedent was wrongly decided'" is required to reverse course. *Kimble*, 576 U.S. at 455-56 (quoting *Halliburton Co. v. Erica P. John Fund, Inc.*, 573 U.S. 258, 266 (2014)). The majority's preference for the reasoning of the *Chavis* dissenter is not enough. *See Dobbs v. Jackson Women's Health Org.*, 597 U.S. 215, 363 (2022) (Breyer, J., dissenting) ("[Stare decisis] is a doctrine of judicial modesty and humility."); *id.* at 388 ("The 'glory' of our legal system is that it 'gives preference to precedent rather than . . . jurists.'") (quoting H. Humble, *Departure From Precedent*, 19 MICH. L. REV. 608, 614 (1921) (alteration in original)).

Moreover, the problem with this flip flop is not limited to undermining the Court's commitment to assuring the consistency of its decisions—though that is reason enough not to disregard *Chavis*. *See Bethea*, 2 Vet.App. at 254. The majority's elevation of form over substance weakens important principles, from the longstanding focus on maximizing benefits to the recent emphasis on holistic analysis, *see, e.g. Jackson v. McDonough*, No. 22-3528, ___Vet.App.___. ___, 2024 WL 3108354, at *9 (Vet. App. June 25, 2024) (observing that statutory construction requires holistic analysis); *Bankhead v. Shulkin*, 29 Vet.App. 10, 22 (2017) ("VA must engage in a holistic analysis in which it assesses the severity, frequency, and duration of the signs and symptoms of the veteran's. . . disorder.")

*By Definition and Record Evidence, the Veteran's*
*Radiculopathy Is an Aspect of Her Spine Disability*

Issues that are inextricably intertwined should be considered together. *See, e.g., Foster v. McDonough*, 34 Vet.App. 338, 353 (2021); *Henderson v. West*, 12 Vet.App. 11, 20 (1998) ("[W]here a decision on one issue would have a 'significant impact' upon another, and that impact in turn 'could render any review by this Court of the decision [on the other] [issue] meaningless and a waste of judicial resources,' the two [issues] are inextricably intertwined." (second alteration in original) (quoting *Harris v. Derwinski*, 1 Vet.App. 180, 183 (1991). The terminology used by VA and the veteran to refer to her lumbar spine disability, and the definitions of those terms, demonstrate the intertwinement of her lumbar spine disability and radiculopathy. More to the point, the veteran's suffering from her lumbar spine disability and her radiculopathy have been longstanding parts of a whole. Ms. De Hart's service, injury, and disability, and VA's treatment of her disability, provide important context.

16

Ms. De Hart retired after 28 years of honorable service on active duty, 1980 to 2008, including over 10 years of foreign service, during which she earned the Armed Forces Expeditionary Medal with four service stars, Southwest Asia Service Medal with three service stars, and Global War on Terrorism Expeditionary Medal. R. at 2587. Describing her service in February 2008, the veteran said that she "set up the first human intelligence operation in Iraq in 1994-95" and that she was shot at many times. R. at 3427. She speaks four languages and worked as a linguist. R. at 294, 1470, 3381. Her service included time at Guantanamo Bay and she was in the Pentagon when the terrorist attack occurred on 9/11. R. at 1470, 3428.

A September 1985 report of medical examination reflected that Ms. De Hart had been diagnosed with spondylolisthesis, which had been noted on a radiographic spine series. R. at 3277-78. An August 1987 service treatment record includes that spondylolisthesis diagnosis and indicates that the veteran had endured low back pain since 1985, when she lifted a very heavy object, apparently during physical training, heard something snap, and experienced tenderness that worsened, and the x-rays that led to her spondylolisthesis diagnosis were taken. R. at 1586, 2557. Her symptoms included pain in her legs and numbness, and it became too painful for her to walk. *Id.*

Spondylolisthesis is the "forward displacement (olisthy) of one vertebra over another." DORLAND'S ILLUSTRATED MEDICAL DICTIONARY 1725 (33d ed. 2020) [hereinafter DORLAND'S]. The slipped vertebra "may put pressure on a nerve, which could cause lower back pain or leg pain." *Spondylolisthesis*, CLEVELAND CLINIC, https://my.clevelandclinic.org/health/diseases/10302-spondylolisthesis (Aug. 7, 2020).

"Radiculopathy describes a range of symptoms produced by the pinching of a nerve root in the spinal column." *Radiculopathy*, JOHNS HOPKINS MED., https://www.hopkinsmedicine.org/health/conditions-and-diseases/radiculopathy#:~:text=Radiculopathy%20describes%20a%20range%20of,%2C%20weakness%2C%20numbness%20and%20tingling (last visited June 27, 2024). "When radiculopathy occurs in the lower back, it is known as lumbar radiculopathy," and "[t]he lower back is the area most frequently affected by radiculopathy." *Id.* Lumbar radiculopathy refers to "any disease of lumbar nerve roots, such as from disk herniation or compression by a tumor or bony spur, with lower back pain and often paresthesias," DORLAND'S at 1547, which includes "burning, prickling, or formication, often in the absence of an external stimulus," *id.* at 1362. VA's initial evaluation of a patient with low back pain is supposed to include consideration

17

of the "[p]resence and severity of radiculopathy." VA/DoD CLINICAL PRACTICE GUIDELINE FOR THE DIAGNOSIS AND TREATMENT OF LOW BACK PAIN 18 (Feb. 2022), available at https://www.healthquality.va.gov/guidelines/Pain/ lbp/VADoDLBPCPGFinal508.pdf.

In January 2008, when Ms. De Hart filed a claim for her spine disability, she called it spondylosis. "Spondylosis refers to the degeneration of the spine, particularly the intervertebral discs and facet joints." *Spondylosis and Spondylolisthesis*, MCGOVERN MEDICAL SCHOOL DEPARTMENT OF ORTHOPEDIC SURGERY, https://med.uth.edu/ortho/spondylosis-and-spondylolisthesis/ (visited June 27, 2024). Degeneration can cause spondylolisthesis. *Id.* The next month, the veteran attended a compensation and pension (C&P) examination for neurological disorders. R. at 3381. Her file reflected that "[s]he was evaluated for residuals of spinal fusion surgery for grade 2 spondylolisthesis in 1989 with residual low back pain and right leg pain." *Id.* She said she had "a low to a moderate level of low back pain every day" and had "some numbness and tingling in her right leg about two days per week." R. 3382. The examiner's impression was "spondylolisthesis with low back and radiating pain to the right leg. Evidence of a S1 radiculopathy on physical examination with diminished ankle jerk." R. at 3383.

In December 2008, Ms. De Hart was granted service connection for her lumbar spondylolisthesis, with a noncompensable evaluation, from the day after she left active duty. R. at 2405-06. The VA regional office (RO) did not address her radiculopathy. She disagreed with the evaluation, saying of her lumbar spondylolisthesis, "I am having severe problems with this condition and it should be evaluated higher." R. at 2377. The RO's SOC affirmed its evaluation, R. at 2177, also without mentioning radiculopathy, and the veteran appealed to the Board, R. at 2155.

In January 2011, VA treated Ms. De Hart's chronic back pain with acupuncture. R. at 1414. In February 2011, she experienced burning low back pain. R. at 1409. In April 2014, she presented with chronic pain in her back, hands, knees, and feet, pain ranging in severity from 7/10 to 10/10, with 8/10 the average. R. at 1586. In January 2015, her pain again was 8/10. R. at 1655-56. In July 2015, she was seen for pain assessment and management and reported constant, chronic back pain, then at 7/10 and ranging from 3/10 to 9/10. R. at 1614-15. She described her back pain as sharp, aching, and throbbing, with increasing pain when she moved or otherwise engaged in activities of daily living. R. at 1615. Her pain affected her sleep, work, and, activity. R. at 1616. She was walking with a cane. R. at 1617.

18

In April 2016, Ms. De Hart attended a back conditions examination by a nurse practitioner. The veteran said that she had constant pain that awakened her at night, limited what she was able to do, and made walking difficult. R. at 1931. She rated her pain at 10 out of 10 when it was bad and 7 out of 10 otherwise. *Id.* She reported severe, incapacitating flare-ups a few times a month. *Id.* And she said: "I can't do normal house hold and yard chores. I can't carry or lift heavy items. Can't walk long distances." *Id.* She was regularly using a cane for stability, support, and balance, and "as a normal mode of locomotion." R. at 1937. Based on that exam, in May 2016 the RO increased her lumbar spondylolisthesis rating from 0 to 10%, effective April 26, 2016. R. at 1886-87.

In January 2017, Ms. De Hart was seen for her low back pain, with occasional radiation to her lower extremities and controlled with diclofenac. R. at 1268. She was walking with a cane. *Id.* The examination report reflects that she was suffering from spondylolisthesis and service-connected intervertebral disc syndrome, rated at 10%. R. at 1269. The term "intervertebral disc syndrome" is a prominent part of the rating formula for disabilities of the spine, but the term is not defined in the regulation. *See* 38 C.F.R. § 4.71a, General Rating Formula for Diseases and Injuries of the Spine, and DC 5243. "Intervertebral disc disease is a common condition characterized by the breakdown (degeneration) of one or more of the discs that separate the bones of the spine (vertebrae), causing pain in the back or neck and frequently in the legs and arms." *Intervertebral disc disease*, MEDLINE PLUS, NAT'L LIBR. OF MED., https://medlineplus.gov/genetics/condition/intervertebral-disc-disease/ (last updated Oct. 1, 2016).

In January 2018, Ms. De Hart participated in a rehabilitation assessment. She said she was enduring constant pain in her low back, then rated at 10/10, and that "she takes prescribed anti-inflammatory and pain medications that decrease[] the pain to 7-9/10." R. at 973. She stated that the pain is aggravated by cold and wet weather, prolonged sitting, prolonged standing, and prolonged walking," and "report[ed] experiencing falls when walking [that happen] suddenly." *Id.* The medical notes at that time and in March 2018 reflect only one spine disability: intervertebral disc syndrome, rated at 10%. R. at 884, 959. But a medical note in April 2018 lists diagnoses of lumbosacral spondylosis and spondylolisthesis, R. at 860; a note in October 2018 lists both, too, and adds intervertebral disc syndrome as a rated disability, R. at 787. A November 2018 note lists lumbosacral spondylosis and spondylolisthesis, but not intervertebral disc syndrome. R. at 771. A December 2018 note lists lumbosacral spondylosis and spondylolisthesis as past history and

19

intervertebral disc syndrome as a rated disability. R. at 625. A January 2019 note has only intervertebral disc syndrome, again as a rated disability. R. at 588. A March 2019 note again lists lumbosacral spondylosis and spondylolisthesis as past history and intervertebral disc syndrome as a rated disability. R. at 527.

Also in March 2019, Ms. De Hart attended another C&P examination to assess the severity of her lumbar spine condition. R. at 1048-49. She was diagnosed with lumbar spondylolisthesis and bilateral lower extremity radiculopathy. R. at 1048-49. She reported that she had constant severe back pain that worsened with any walking and intermittent numbness that radiated down both legs and varied in severity. R. at 1049. The veteran said her activities had been limited because of her back pain for 23 of her 28 years of active duty. *Id.* She reported significant functional loss: she cannot stand or walk for prolonged periods of time; cannot run or jump' cannot do heavy lifting, pushing, or pulling; cannot do housework or yard work; cannot do repetitive bending, kneeling, or squatting; cannot drive for prolonged periods of time without stopping for rest; cannot dance; and cannot lay in a bathtub. *Id.*; R. at 1055-56.

On examination, Ms. De Hart exhibited abnormal range of motion, with pain on flexion, extension, and rotation, pain with weight bearing (and non-weight bearing), and tenderness on palpation. R. at 1050, 1056. She had decreased sensation in her thighs, knees, lower legs, ankles, feet, and toes. R. at 1052. She had severe, constant radicular pain and severe numbness and abnormal touch sensations (such as burning or prickling) in her right and left lower extremities. R. at 1053. The veteran's bilateral radiculopathy involved the nerve roots of five vertebrae—L4, L5, S1, S2, and S3. *Id.* And the veteran had intervertebral disc syndrome. *Id.* Her back condition required the constant use of a cane and occasional use of a walker. R. at 1054. Imaging documented arthritis in her lumbar spine, with degenerative and postsurgical changes and mild to moderate canal and foraminal stenosis at multiple levels. R. at 1055. The examining physician opined that the veteran's "[bilateral lower extremity (B/L LE)] [r]adiculopathy is a progression of [her] service[-]connected back condition." R. at 1056.

A July 2019 medical note lists spondylolisthesis in the veteran's history but intervertebral disc syndrome as the only rated spine disability. R. at 293.

In September 2019, the RO declared that it had "made a partial decision on the issue of increased evaluation for [the veteran's] service connected back condition," increased the veteran's lumbar spondylolisthesis rating to 20%, and granted service connection and 20% ratings for her

20

bilateral lower extremity radiculopathy, each effective March 7, 2019. R. at 1027. The RO's notice of its decision told Ms. De Hart what to do if the decision satisfied her claim and she wished to withdraw all remaining issues associated with her appeal, R. at 1015, and what to do if she disagreed with the RO's decision, R. at 1017. The record reflects no indication that she expressed either full satisfaction or disagreement with the RO's decision (beyond what she submitted in February 2009, R. at 2377).

A January 2021 SSOC described the March 2019 increased rating for lumbar spondylolisthesis as "a partial grant of the issue on appeal regarding evaluation of lumbar spondylolisthesis, as this increase is granted at a date later than the claim associated with the rating decision under appeal, and is not the maximum schedular evaluation for this disability." R. at 73. The SSOC noted intervertebral disc syndrome only to state that a higher evaluation was not warranted for that disability. *Id.* The SSOC did not mention the veteran's radiculopathy.

The June 2021 Board decision denied increased ratings for Ms. De Hart's lumbar spondylolisthesis, before and after March 2019. The Board grounded its action on the veteran's February 2009 statement of disagreement. R. at 14. The Board specifically noted that, "[i]n a September 2019 rating decision, the RO assigned a 20 percent rating for lumbar spondylolisthesis and 20 percent ratings for both right and left lower extremity radiculopathies as of March 7, 2019," R. at 16, but did not further address the radiculopathy ratings.

*The Jurisdiction Rationalization*

Though he did not do so in his original brief, the Secretary now argues that the Board had no jurisdiction over the radiculopathy ratings. *See* Secretary's Response to the Court's July 12, 2023 Order; Oral Argument at 38:39–41:30, https://www.youtube.com/watch?v=yl2G-PFhZVs&t=6s. The majority steers clear of the Secretary's "no jurisdiction" incantation, but nonetheless absolves the Board of any obligation to have addressed the veteran's radiculopathy ratings. In light of the Board's silence on its jurisdiction and the Board's failure to state any position on those ratings, I would explicitly reject the Secretary's post hoc rationalization. *See In re Lee*, 277 F.3d 1338, 1345-46 (Fed. Cir. 2002) ("'[C]ourts may not accept appellate counsel's post hoc rationalization for agency action.'" (quoting *Burlington Truck Lines, Inc. v. United States*, 371 U.S. 156, 168 (1962))). At the very least, I would vacate the Board decision and remand for the Board to speak for itself on its jurisdiction and position on the veteran's radiculopathy ratings. *See*

21

*Simmons v. Wilkie*, 30 Vet.App. 267, 277 (2018) (holding that the "Court cannot accept the Secretary's post-hoc rationalizations" to cure the Board's reasons-or-bases errors).

Moreover, the Court should reject the Secretary's effort to shield the radiculopathy ratings for the veteran's disability from appellate review. The Board had jurisdiction here because Ms. De Hart appealed the RO's denial of her claim for benefits based on her service-connected lumbar spine disability. *See Hall v. McDonough*, 34 Vet.App. 329, 333 (2021). Jurisdiction is about subject matter. *Ferko v. McDonough*, No. 21-3467, ___ Vet.App. ___, ___, 2024 WL 2721889, at *3 (Vet. App. May 28, 2024) (en banc). The veteran's statement of disagreement matched the term for her disability VA used, and both she and VA knew that the "severe problems" she was having with her "lumbar spondylolisthesis" included pain radiating to her lower extremities, which her medical records had documented since 1985. Here, as in *Chavis*, the Secretary's common "no jurisdiction" incantation should be rejected. *See Chavis*, 34 Vet.App. at 15-17.

### The Silence of the Board

Both fidelity to *Chavis* and attention to the details of this case highlight the necessity of returning this to the Board. First, the Board acknowledged *Chavis*, but only in connection with finding that "the evidence does not indicate the functional equivalent of lumbar spine ankylosis at any time." R. at 17.  It is axiomatic that

> any rulings, interpretations, or conclusions of law contained in [a precedential decision of this Court] are authoritative and binding as of the date the decision is issued and are to be considered and, when applicable, are to be followed by VA agencies of original jurisdiction, the Board of Veterans' Appeals, and the Secretary in adjudicating and resolving claims.

*Ramsey v. Nicholson*, 20 Vet.App. 16, 23 (2006) (quoting *Tobler v. Derwinski*, 2 Vet.App. 8, 14 (1991)). More than that, the statutory requirement that the Board state the reasons or bases for its findings and conclusions on all material issues of law, 38 U.S.C. § 7104(d)(1), means that the Board must "discuss all provisions of law and regulation that are made 'potentially applicable through the assertions and issues raised in the record.'" *Lile v. McDonough*, 37 Vet.App. 140, 146–47 (2024) (quoting *Schafrath v. Derwinski*, 1 Vet.App. 589, 592 (1991)). The Board's complete silence on the potential application of *Chavis* to Ms. De Hart's bilateral lower extremity radiculopathy falls far short of this settled standard, requiring remand.

22

*VA's Duty to Maximize Benefits and Continued Appellate Status*

Second, the Board failed to completely answer whether the veteran's appeal, initiated by her February 2009 statement giving notice of her disagreement with the rating of her spine disability, was fully satisfied by the RO's September 2019 awards or remained in appellate status. *See AB v. Brown*, 6 Vet.App. 35, 38 (1993). "[O]n a claim for an original or an increased rating, the claimant will generally be presumed to be seeking the maximum benefit allowed by law and regulation, and it follows that such a claim remains in controversy where less than the maximum available benefit is awarded." *Id.* When a claimant has disagreed with an RO decision assigning a particular rating, a subsequent RO decision awarding a higher rating, but less than the maximum available benefit, does not abrogate the pending appeal or require a new Notice of Disagreement as to that subsequent decision. *Id.*

The Board cited *AB* and applied it to find that the veteran's lumbar spondylolisthesis rating—though increased to 20%—"does not represent the maximum rating assignable for this disability and the [v]eteran has not indicated that the current staged ratings are the maximum benefit sought, so the claim remains on appeal." R. at 7. But the Board did not even mention the appellate status of the veteran's radiculopathy claim, which had been deemed raised by the very same January 2008 spine disability claim, R. at 4208, and thus encompassed by her same statement of disagreement, R. at 2377, and adjudicated with the same preface—that it was "a partial decision on the issue of increased evaluation for [her] service connected back condition," R. at 1027. Moreover, the RO's September 2019 notice of its benefits decision also communicated that its evaluation was of three peas in a pod—including specific ratings and effective dates for Ms. De Hart's lumbar spondylolisthesis and her right and left lower extremity radiculopathies. R. at 1015-17. If the veteran's spondylolisthesis and radiculopathies were on different footing, the RO's notice did not say so, or even offer a hint that maximizing benefits for the pain and functional impairment flowing from her spine to her lower extremities was being limited to her spine.

"The VA disability compensation system is not meant to be a trap for the unwary, or a stratagem to deny compensation to a veteran who has a valid claim." *Comer v. Peake*, 552 F.3d 1362, 1369 (Fed. Cir. 2009). In other words, "[t]he government's interest in veterans cases is not that it shall win, but rather that justice shall be done, that all veterans so entitled receive the benefits due to them." *Barrett v. Nicholson*, 466 F.3d 1038, 1044 (Fed. Cir.2006).

23

VA's duty to maximize benefits "is rooted in 38 C.F.R. § 3.103(a), which requires VA to 'render a decision which grants every benefit that can be supported in law while protecting the interests of the Government.'" *Morgan v. Wilkie*, 31 Vet.App. 162, 167 (2019). That means "VA is obligated to develop and adjudicate a claim in a manner that ensures a veteran obtains the maximum benefits allowable in a given context." *Stowers v. Shinseki*, 26 Vet.App. 550, 555 (2014). Especially noteworthy here, obligatory development includes identifying symptoms of a disability that warrant an increased disability rating. *Tatum v. Shinseki*, 23 Vet.App. 152, 157 (2009).

Consonant with these principles, the Court should not sanction the shadowy sidetracking of the radiculopathy part of the veteran's spine disability claim that enables VA to sidestep its duty to maximize benefits.

### *The* Chavis *Match*

Here, as in *Chavis*, "the lay and medical evidence throughout the appeal period of the lumbar spine claim reflects neurologic signs and symptoms that have now been attributed to the bilateral lower extremity radiculopathy." 34 Vet.App. at 15. Ms. De Hart endured low back pain and pain and numbness in her legs from the time of her in-service back injury in 1985. *See* R. at 1586, 2557. VA has characterized her spine disability at least four different ways in the 36 years from her in-service injury to the June 2021 Board decision: as lumbosacral spondylosis, lumbar spondylolisthesis, intervertebral disc syndrome, and bilateral lower extremity radiculopathy. In March 2019, confronted by Ms. De Hart's abnormal range of motion; pain on motion, weight bearing and non-weight bearing, and palpation; decreased sensation in her thighs, knees, lower legs, ankles, feet, and toes; severe, constant radicular pain and severe numbness and abnormal touch sensations (such as burning or prickling) in her right and left lower extremities; documented arthritis in her lumbar spine, with canal and foraminal stenosis at multiple levels; and bilateral radiculopathy involving the nerve roots of five vertebrae, all requiring the constant use of a cane and occasional use of a walker, a VA examining physician opined that the veteran's bilateral lower extremity radiculopathy is a progression of her service-connected back condition. R. at 1050-56. Those circumstances meet or exceed the *Chavis* standard for radiculopathy that is part of the veteran's lumbar spine disability. *See* 34 Vet.App. at 15.

As in *Chavis*, considering Ms. De Hart's "lumbar spine disability as including neurologic manifestations is consistent with provisions of VA's Adjudication Procedures Manual that discuss

24

the interrelated nature of orthopedic and neurologic manifestations of spine disabilities." *See Chavis*, 34 Vet.App. at 16. Specifically, "adjudicators are to 'evaluate conditions based on chronic orthopedic manifestations . . . and any associated neurological manifestations . . . by assigning separate evaluations for the orthopedic and neurological manifestations.'" *Id.* (quoting M21-1, III.iv.4.A.5.a, now M21-1,V.iii.1.B.3.a.). *See* 38 C.F.R. § 4.71a, General Rating Formula for Diseases and Injuries of the Spine, Note (1) ("Evaluate any associated objective neurologic abnormalities . . . separately, under an appropriate diagnostic code."). And, "'[b]ecause spinal disease can cause objective neurologic abnormalities, the onset of a neurologic complication represents medical progression or worsening of the spinal disease,' [adjudicators are] to treat a claim asserting a new neurologic complication as a claim for increase of the underlying spine disease." *Chavis*, 34 Vet.App. at 16 (quoting M21-1, III.iv.4.A.5.d., now M21-1, V.iii.1.B.3.d.).

Again as in *Chavis*, considering Ms. De Hart's "neurologic manifestations as part of the claim seeking higher compensation for the lumbar spine disability is also consistent with VA's duty to sympathetically read pro se pleadings." *See Chavis*, 34 Vet.App. at 16. VA is required to "give a sympathetic reading to the veteran's filings by 'determin[ing] all potential claims raised by the evidence, applying all relevant laws and regulations.'" *Szemraj v. Principi*, 357 F.3d 1370, 1373 (Fed. Cir. 2004) (quoting *Roberson v. Principi*, 251 F.3d 1378, 1384 (Fed. Cir. 2001)). "In direct appeals, all filings must be read 'in a liberal manner' whether or not the veteran is represented." *Robinson v. Shinseki*, 557 F.3d 1355, 1361 (Fed. Cir. 2009), *aff'g Robinson v. Peake*, 21 Vet.App. 545 (2008). In addition, "'the Board is required to adjudicate all issues reasonably raised by a liberal reading of . . . the record prior to the Board's decision.'" *Brokowski v. Shinseki*, 23 Vet.App. 79, 85 (2009) (quoting *Brannon v. West*, 12 Vet.App. 32, 34 (1998)). And the Board "is obligated to develop and adjudicate claims for secondary service connection that are reasonably raised during the processing of a properly initiated claim as to the primary service-connected disability's evaluation level." *Bailey v. Wilkie*, 33 Vet.App. 188, 201 (2021)

## *Conclusion*

It is unfortunate that the judicial modesty and humility that moved the *Chavis* Court to acknowledge that its precedential decision might not have universal, ironclad application to every single claim involving a spine disability and radiculopathy is used to accomplish what neither party sought nor any appellate court awarded: complete reversal of that decision by this one. That outcome is inappropriate without full Court consideration and also unwarranted, with no

justification more special than having two Judges who disagree with *Chavis*. Perhaps the Secretary blanched at asking the Court to ignore such recent precedent, because he asserted in his brief that "[r]emand is warranted for [a]ppellant's claim seeking higher ratings for her service-connected back condition prior to March 7, 2019, and thereafter *and an earlier effective date for her lower extremity radiculopathy*," Secretary's Br. at 21-22 (emphasis added). But then a different appellate attorney said the brief was mistaken and instead argued that the Board had no jurisdiction to address the effective date for the veteran's radiculopathy ratings. Oral Argument at 1:03:19–1:04:15, https://www.youtube.com/watch?v=yl2G-PFhZVs&t=6s. Accepting the Secretary's invitation to wipe away *Chavis* in favor of compartmentalizing case components is another blow for the bureaucracy and against a veteran-friendly system. I respectfully dissent.

26